**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**ELIZABETH ZEISLOFT SHENK**                    NO. 1:11-CV-1238

**v.**                                                                    **JUDGE JONES**

**COMMONWEALTH OF PENNSYLVANIA**        **MAGISTRATE JUDGE METHVIN**
**PENNSYLVANIA BOARD OF PROBATION**
**   AND PAROLE**
**CATHERINE MCVEY**
**JOHN TUTTLE**

**REPORT AND RECOMMENDATION
ON MOTION FOR SUMMARY JUDGMENT
(Doc. 31)**

Elizabeth Shenk filed this employment discrimination action on June 30,

2011, alleging gender discrimination as well as retaliation in violation of, *inter alia*,

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; the

Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq*; and the Family Medical

Leave Act, 29 U.S.C. §§ 2601-2654 (Doc. 1).[1] Named as defendants are the

Commonwealth of Pennsylvania; Pennsylvania Board of Probation and Parole;

Catherine McVey, Parole Board Chairwoman; and John Tuttle, Parole Board

---

[1] Specifically, the complaint brings claims for retaliation under Title VII (Count I) and the PHRA (Count II); gender discrimination under Title VII (Count III) and the PHRA (Count IV); USERRA retaliation (Count V); FMLA retaliation (Count IV); and disability retaliation (Count VII). The claims are brought against all defendants except Counts I and III, which are asserted against the Commonwealth and the Parole Board only. By Order dated February 12, 2012, Judge Jones dismissed Counts II, IV and VII as to the Commonwealth and Parole Board. (Doc. 18).

Executive Director. This court has jurisdiction over the matter under 28 U.S.C. §§ 1331 and 1367.

Before the court is a motion summary judgment filed by defendants.[2] The motion has been referred to the undersigned for a report and recommendation and is now ripe for disposition.[3]

## FINDINGS AND RECOMMENDATIONS

### I. Background

Viewed in a light most favorable to Shenk, the factual background is as follows: Shenk began her employment with the Parole Board in June, 2007 as the Director of the Office of Administrative Services (OAS). (Docs. 32, 38 ¶ 5). McVey, as Chairman of the Parole Board, was its chief executive and responsible for the overall administration of program activities and services. (*Id*. ¶ 7). Shenk reported directly to McVey. (*Id*. ¶ 9). As Director of OAS, Shenk oversaw the administrative and management services of the agency through subordinate

---

[2] Defendants filed a motion for summary judgment on July 31, 2012 along with a statement of material facts (Docs. 31, 32) and thereafter filed a supporting brief on August 14, 2012 (Doc. 36). Shenk filed exhibits, an answer to the statement of facts and a brief in opposition to the motion on September 4, 2012. (Docs. 37, 38, 39). Defendants filed a reply brief on October 3, 2012. (Doc. 45).

[3] On August 1, 2012, Judge Jones referred the present motion to the undersigned. (Doc. 33).

managers, and assisted the Chairman in directing all staff services for the agency, including staff development and training, organizational analysis, equal employment opportunity, budget analysis, and other related administrative functions. (*Id*. ¶ 12).

Tuttle, as Director of the Office of Probation and Parole Services, oversaw the operations side of the organization, including the bulk of the Board's employees. All agents from across the Commonwealth "had line authority to this position." (*Id*. ¶¶ 13, 14). McVey appointed Tuttle as deputy executive director, which made him second in command under McVey. When McVey was unavailable, which was often, according to Shenk, Tuttle was first in command. (*Id*. ¶ 15; Doc. 37-5, McVey Depo. 14:10-16; Doc. 37-1, Shenk Affidavit ¶¶ 3-6).

Prior to Shenk, the OAS director was Gary Scicchitano. (*Id*. ¶ 17). In January, 2007, inappropriate materials were found on Scicchitano's computer, and an investigation was begun. (*Id*. ¶ 18). Thereafter, several females employees made sexual harassment complaints against Scicchitano, including an allegation that he sexually accosted a female co-worker in a hotel room. (*Id*.). McVey suspended Scicchitano while he was on vacation, and he retired in late January 2007, prior to the conclusion of the investigation. (*Id*. ¶ 19).

Shenk applied for the OAS director position and she was interviewed by McVey and Tuttle. (*Id*. ¶ 21). During the interview, McVey stressed that the person selected was to assume responsibility for developing the budget. (*Id*. ¶ 23). Shenk's work experience included previous positions at the Department of Public Works, where she had significant responsibility for the budget, and the Governor's Budget Office, where she worked as a fiscal policy specialist. (Doc. 38 ¶ 26).

Defendants contend McVey had problems with Shenk's performance "early in her time with the Board," but Shenk points out the first evidence of this allegation is a memo prepared by McVey dated October 2, 2008, after Shenk had filed a complaint with the PHRC. (Docs. 32, 38 ¶ 24).

It is disputed whether, at the time, McVey became critical of Shenk's work performance on the budget as well as a pay differential proposal. (Docs. 32, 38 ¶¶ 26, 27). Shenk points to the deposition of another employee who worked on the pay differential proposal, in which she testified that McVey was pleased with the final product. (Doc. 38 ¶ 27).

It is undisputed that McVey was critical of Shenk's work on an investigation into complaints of sexual harassment against two supervisors—Craig Williams and James Commins, following a training seminar in December 2007. (Docs. 32, 38 ¶¶ 28, 29). When the allegations came to light, McVey suspended the two men pending

an investigation. (Docs. 32, 38 ¶ 34). The investigation was conducted by two different departments—HR and the EEO Department Director, Lee Mix.

Shortly after the men were suspended, Mix informed Shenk about the investigation. (*Id*. ¶ 35). Shenk conducted her own investigation and found probable cause for the accusations of severe sexual harassment. (Doc. 38 ¶ 29). Shenk prepared a written recommendation containing her findings dated January 28, 2008 (Doc. 37-13; Doc. 38 ¶ 29). The report stated, in pertinent part:

> It is the opinion of this decision maker that further appropriate disciplinary actions need to be taken to prevent further harassment and unprofessional, inappropriate conduct by these supervisors to any Board employee, parolee, vendors, and or the general public.
>
> In addition, Mr. William and Mr. Commins must be informed that they are not to participated in any type of retaliatory activities. The Board and Commonwealth's prohibition against retaliation includes speaking to complainants about the subject of the complaint, and other actions such as isolation, harassing behavior, changing work assignments and making demands that appear to be work-related but have a retaliatory purpose. Directing, prompting, or encouraging others to commit retaliatory acts also constitutes a violation of the anti-retaliation provisions. It must be emphasized that such actions on their part will not be tolerated and could serve as an independent basis for discipline up to and including discharge.

(Doc. 37-13 p. 3).

Shenk showed her recommendation to Charlene Couch, attorney for the Office of the Administration, and Linda Laub, attorney for the Parole Board. While

Couch considered the recommendations "solid," Laub, without noting a problem

with the recommendation itself, was upset that the recommendation was in writing,

and directed Shenk to shred the document. (Doc. 37-2, Shenk Depo. pp. 144:17 –

146:18).

In a report dated February 11, 2008, the HR Department recommended that

District 2 Director Williams receive a long-term suspension without pay, and that he

be reassigned to a position outside of the Harrisburg District within the same pay

range. On the same date, HR recommended that Deputy Director Commins (who

reported to Williams) receive a ten-day suspension for his violations of the Code of

Conduct. (Doc. 32-7, pp. 25-32).

McVey elected harsher punishment than recommended by HR. She suspended

both men, demoted Williams from his position as Director, and returned Commins

to his position as Deputy Director. (*Id*. ¶ 37).[4] On appeal, the Civil Service

Commission substantially affirmed the decision, although it overruled Williams'

suspension, reasoning that the Board could not both suspend and demote him. (*Id*. ¶

38).

---

[4] Shenk had recommended that the two receive instruction regarding retaliation. (Doc. 38 ¶ 37).

There is a dispute whether Shenk provided McVey with correct information on how to proceed once the investigations were complete. (Docs. 32, 38 ¶ 39). Shenk's alleged "wrong guidance" on this point was the "breaking point" for McVey. (*Id*. ¶ 55). Shenk denies this allegation, and contends that McVey was unable to provide factual support for it in her deposition (Doc. 38 ¶ 39).

In early 2008, Bureau of Budget Director Dick Dash and HR Director Brenda Estep, both subordinates of Shenk, spoke to McVey about their difficulty in working with Shenk. (Docs. 32, 28 ¶ 50). Shenk asserts that both individuals wanted her position, and had previously been rejected in favor of Shenk. (Doc. 38 ¶ 50). Dash ultimately succeeded Shenk. (*Id*.).

On April 1, 2008 McVey met with Shenk and told her she had 30 days to seek other employment. (Docs. 32, 38 ¶ 56).[5] McVey specifically mentioned Shenk's handling of the Williams/Commins investigation. (*Id*. ¶ 39). McVey showed Shenk an unsatisfactory performance evaluation she had prepared, but which had not been

---

[5] Defendants refer to this directive as an "ultimatum" and state that Shenk was not terminated at this time. However, in its usual meaning, "ultimatum" implies a consequence will result from noncompliance. Indeed, the term is defined by Merriam-Webster as "a final proposition, condition, or demand; especially: one whose rejection will end negotiations and cause a resort to force or other direct action." Here, defendants contend that the April 1, 2008 directive was not a termination of Shenk's employment. However, they fail to clearly state what action would result if Shenk did not secure other employment within 30 days.

signed. (*Id*. ¶ 56). According to McVey, she did not want to damage Shenk's

professional reputation with such a poor performance review, and she denies ever

mailing a copy to Shenk. (Doc. 32 ¶¶ 56, 57). Shenk alleges that she received a copy

of the negative evaluation in the mail sometime in the summer of 2008, after she

had already left for FMLA leave. (Doc. 38 ¶ 57).

On April 16, 2009, Shenk requested Sick, Parental or Family ("SPF") leave.

Such leave requires certification on the Commonwealth's Serious Health Condition

form. (*Id*. ¶ 68). The medical reason for SPF leave is kept strictly confidential. (*Id*. ¶

71). Heather Rickenbaugh (now Coyer), an SPF coordinator, contacted Shenk by

letter to inform her that the Serious Health Condition form was incomplete. (*Id*. ¶

75). Shenk completed the SPF form requesting leave from May 1, 2008 to July 31,

2008. (*Id.* ¶ 77). Rickenbaugh sent a letter to Shenk on May 6, 2008 informing her

that her FMLA leave to care for her mother was approved with a scheduled return to

work date on August 1, 2008. (*Id*. ¶ 78). A subsequent leave request from August 1,

2008 to September 1, 2008 was approved on August 28, 2008. (*Id*. ¶ 79).[6]

On June 12, 2008, Shenk emailed McVey to inform her of both her mother's

health and her job search. (*Id*. ¶ 86). McVey sent an letter to Shenk on July 2, 2008

---

[6] Both the May and August correspondence were sent to the agency and to McVey as
Shenk's supervisor. (*Id*. ¶ 80).

reminding her of the April 1, 2008 directive to seek other employment and informing her that she would be expected to comply with the directive upon her return from FMLA leave. (*Id*. ¶ 87; Doc. 32-13, Ex. II, p. 2). Shenk contends the letter was sent for the purpose of threatening Shenk. (Doc. 38 ¶ 87). The letter ends with the statement, "[p]lease be advised that your failure to comply with my directive by [August 1, 2008] will result in appropriate administrative action being taken." (Doc. 32-13, Ex. II, p.2). Defendants deny that McVey's letter was related to Shenk's SPF leave, and allege it was simply sent as a reminder that McVey was dissatisfied with Shenk's employment performance. (Doc. 32 ¶ 88).

No further action was taken by McVey on Shenk's employment inasmuch as Shenk secured another position. (Docs. 32, 38 ¶ 90).

Before her FMLA leave, Shenk states that she requested leave for the afternoon of January 15, 2008 because her mother was having eye surgery. (*Id*. ¶ 95). Shenk did not submit a leave slip because she that she returned to work following her mother's surgery and worked a full day. (Doc. 38 ¶ 96).

Prior to April 1, 2008, Shenk utilized only 2.5 hours of Sick Family Leave. All other leave she took was either sick, personal or administrative. (Docs. 32, 38 ¶ 97). Shenk contends that, when caring for her mother, she used her own annual

and personal leave, and that this is consistent with Commonwealth policy. (Doc. 38 ¶ 97).

The parties dispute whether McVey knew the extent of Shenk's mother's medical condition. Defendants contend McVey was "unaware of the severity of plaintiff's mother's medical condition," and only knew that Shenk took her mother to appointments. (Doc. 32 ¶ 98). Shenk contends that she regularly discussed her mother's poor health with McVey. (Doc. 38 ¶ 98). Although she does not recall stating to McVey that her mother was disabled, Shenk avers she did convey the fact that her mother suffered from serious health conditions, including diabetes, that substantially impaired her eyesight and caused serious heart problems. (*Id*. ¶ 99). Shenk contends that the defendants became hostile about her mother's disability; that McVey told her to put her mother in a nursing home; and that McVey expressed contempt for Shenk's caretaker responsibilities. (Docs. 32, 38 ¶¶ 101-102, 105).

EEO director Mix was responsible for reviewing all personnel transactions for potential underutilization of particular demographic groups. (*Id*. ¶ 144). As such, Mix wrote reports identifying potential issues of underutilization. (*Id*. ¶ 145). Shenk asserts that despite Mix's role, some Parole Board members would find ways to circumvent efforts to correct utilization problems. (*Id*. ¶ 146). However, the Parole Board's statistics for utilization have improved due to Mix's conversations with

individuals responsible for making selections.(*Id*. ¶ 147). In one instance, Mix and Williams disagreed about potential hires and had a meeting to discuss the matter. (*Id*. ¶ 148). Nonetheless, many of the candidates Mix suggested were hired in the end. (*Id*.).

Shenk also alleges that the Parole Board engaged in discrimination against veterans in its hiring. (*Id*. ¶ 150). Mix was unaware of anyone being discriminated against based on veteran status and, in fact, many of the people hired by the Parole Board are veterans. (*Id*. ¶¶ 168, 169). On occasion, if a veteran notation on the certification[7] was missed by an analyst, the Civil Service Commission notified the office of that there had been an illegal hire. (*Id*. ¶ 164). Shenk contends that the discrimination against veterans was evidenced by an October, 2007 memo by Williams appealing the EEO recommendations in the agent selection process. (*Id*. ¶ 166). The memo states that the candidate, a Marine and a former employee of Blackwater Security in Iraq, was "comfortable in his element as a paid mercenary or Marine Sniper" and it notes the "fear we would have placing a Board issued firearm in the hands of this gentleman and what could be the result if an offender insulted him or made him upset." (Doc. 38 ¶ 166). Shenk asserts this shows bias against veterans and stereotypes them as untrustworthy with firearms as they may become

---

[7] Certification of eligible candidates per the CSC.

unhinged. (*Id*.). Shenk alleges that she brought these concerns of discrimination against veterans to Mix's attention. (Doc. 38 ¶ 171).

On August 25, 2008, Shenk dual-filed a complaint with the EEOC and PHRC alleging gender discrimination, association discrimination and retaliation. (*Id*. ¶ 91). The present action followed.

## II. Issues Presented

The motion raises the following issues for summary judgment:

1. Shenk is unable to establish her gender discrimination claim under Title VII and the PHRA.

2. Defendants are entitled to summary judgment on Shenk's retaliation claims brought under Title VII and the PHRA.

3. Shenk is unable to establish that the defendants discriminated against her based on her mother's disability.

4. McVey and Tuttle are entitled to summary judgment on Shenk's USERRA claim because she cannot show that they discriminated against her based on her advocacy of those with military status.

5. Defendants are entitled to summary judgment on Shenk's FMLA retaliation claim.

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion

lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## IV. Discussion

*(A) Discrimination*

The amended complaint brings claims of gender discrimination in violation of Title VII and the PHRA. Under Title VII, it is unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000(e)(2). The PHRA likewise prohibits discrimination by employers on the basis of gender or race. *See* 43 P.S. § 955.[8]

In considering a motion for summary judgment in a Title VII case where, as here, the plaintiff's Title VII case relies upon indirect evidence, the Court of Appeals for the Third Circuit applies the three-step burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must show a prima facie case. If the plaintiff is able to establish a prima facie case, the burden shifts to the employer to produce a "legitimate, non-discriminatory reason for the employee's rejection," *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981), "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742,

---

[8]  The court will analyze the Title VII and PHRA claims under the same standards inasmuch as courts generally have interpreted the PHRA in accordance with the standards applied to claims brought under Title VII of the Civil Rights Act of 1964. *Grande v. State Farm Mut. Auto. Ins. Co.*, 83 F. Supp. 2d 559, 562 (E.D. Pa. 2000).

125 L.Ed.2d 407 (1993)); *see also Sarullo v. U.S. Postal System,* 352 F.3d 789, 799 (3d Cir. 2003) (noting that the defendant must "clearly set forth, through the introduction of admissible evidence, reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.") (*quoting St. Mary's Honor Ctr.,* 509 U.S. at 507) (internal quotation marks omitted).

If the employer offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff, who must then show that the reasons offered by the employer are mere pretexts for discrimination." *Young v. Pennsauken Twp. School Dist.*, 47 F. App'x. 160, 161 (3d Cir. 2002) (citing *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089; *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).[9] To show pretext, a plaintiff must identify evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Potoski v. Wilkes University*, 692 F. Supp. 2d 475, 484 (M.D. Pa. 2010) (quoting *Fuentes,* 32 F.3d at 764).

---

[9] Within this framework, although the burden of production shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

The plaintiff may make this showing in either of two ways. One, the defendant's proffered reasons may be shown to be "weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108–09 (3d Cir. 1997); *accord Fuentes* 32 F.3d at 765. Two, the plaintiff may provide "evidence that 'the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it could not have been the employer's real reason." *Id.* (quoting *Jones*, 198 F.3d at 413). Thus, summary judgment is appropriate on behalf of the employer if the employee fails to meet her burden at either the prima facie or the pretext stage of the framework.

*(1) Prima facie case*

To establish a prima facie case of discrimination, a plaintiff must show that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). In the present case, the parties concede that the first and third elements of a prima facie case have been established, *to wit.*, that Shenk is a member of a protected class and that she suffered an adverse employment action. Defendants argue Shenk has

failed to put forth evidence to satisfy the second and fourth prongs—that she was qualified for the position and that the circumstances give rise to an inference of discrimination.

### (a) Qualified

Defendants argue that Shenk was not qualified for the position she held because McVey was dissatisfied with Shenk's work performance. When evaluating whether a plaintiff is "qualified" for the purposes of a prima facie case, courts must rely upon "objective" factors. *Harry v. City of Philadelphia*, No. 03-661, 2004 WL 1387319, *3 (E.D. Pa. June 18, 2004). *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir.1995) (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir.1990)). Subjective elements of job qualifications are "better left to the later stage of the *McDonnell Douglas* analysis." *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir.1997) (noting that "past rulings prevent satisfaction of an employer's expectations from being a requisite element of a prima facie employment discrimination case."); *see also Fitzpatrick v. Nat'l Mobile TV.*, 364 F. Supp.2d 483, 489 (M.D. Pa. 2005) ("Subjective analysis of a plaintiff's job performance is inappropriate at the prima facie stage, and is properly suited as a legitimate nondiscriminatory reason for termination.... [T]he proper inquiry is whether the plaintiff is objectively qualified to perform the job.").

Defendants do not contend that Shenk did not possess objective factors such as education and experience for the position she held. For purposes of a prima facie case of discrimination, Shenk has satisfied the second element.

### (b) Inference of discrimination

The parties also dispute whether the circumstances give rise to an inference of discrimination. A plaintiff can satisfy the fourth element of a prima facie case in a variety of ways. *D'Altilio v. Dover Twp.*, No. 1:06-CV-1931, 2009 WL 2948524, *7 (M.D. Pa. Sept. 14, 2009). The fourth step of his prima facie case may be shown with evidence that the employer replaced plaintiff with someone outside of the protected class. *Id. See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir.1996) (fourth element may be satisfied by "a rejection of plaintiff accompanied, or followed by, a filling of the job with a person not belonging to the protected category")*; Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1066 n. 5 (3d Cir.1996); *Marzano v. Computer Science Corp.*, 91 F.3d 497, 503 (3d Cir.1996) (a plaintiff can raise an inference of discrimination by showing that he was replaced by someone outside the protected class); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.1987) (fourth element satisfied if plaintiff is replaced by a person sufficiently outside the protected group to permit an inference of discrimination)

(*abrogated on other grounds as recognized in McKenna v. Pac. Rail Serv.*, 32 F.3d

820 (3d Cir.1994)).

    Shenk submits that she has satisfied this element by demonstrating she was

replaced by Dick Dash, a male and thus a person outside of her protected class.[10]

Accordingly, the fourth element has been shown, and Shenk has stated a prima facie

case for gender discrimination. *See McClain v. Pennsylvania, Dept. of Corrections*,

No.09-1641, 2011 WL 2670204, *6 (W.D. Pa. July 07, 2011) (because plaintiff, an

African-American, was replaced a white woman, he met the requirements of the

fourth element of the prima facie case.).

    *(2) Legitimate non-discriminatory reason*

    A prima facie case having been established, the burden now shifts to

defendants to articulate a legitimate non-discriminatory reason for their action

Defendants contend that Shenk was dismissed because she performed poorly, she

failed to act in conformity with Parole Board and Commonwealth procedures, and

McVey had issues with Shenk's skills and knowledge and Shenk had been late to, or

absent from, meetings. Accordingly, the burden shifts back to Shenk to establish

that the reasons proffered by the defendants are pretextual. *See e.g., Woodson v.*

---

[10] Although defendants submit that Shenk has failed to show that similarly-situated
individuals outside of the protected class were treated more favorably, this is but one way
of demonstrating the fourth prong of a prima facie case of discrimination

*Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir.1997) (noting that the defendant's burden at this stage is relatively light and that it is satisfied if the defendant articulates a legitimate reason for the adverse employment action).

### (3) Pretext

Defendants contend that Shenk has shown no evidence of pretext. Shenk argues that she can establish that the defendants reasons for terminating her are not worthy of credence.

### (a) Violation of civil service rules

Defendants contend that Shenk acted contrary to Parole Board and Commonwealth HR policies when she directed staff to make a potentially illegal hire. The incident involved a state representative who called to complain about a candidate not being hired. (Doc. 32 ¶ 51). Shenk testified in her deposition that she never spoke to a state representative, and gave no assistance to the person in question. (Doc. 37-2, Shenk Depo. 128:19-25; Doc. 38 ¶ 51). McVey could not recall, during her deposition, what efforts Shenk made to hire the individual or whether she ever spoke to Shenk about the matter. Such a lack of recollection strains the reasonableness that this incident forms a legitimate basis for Shenk's dismissal. Consequently, a finding of pretext could be made thereon.

Defendants also assert that Shenk directed employees to reclassify a budget analyst position without performing an audit as required by Commonwealth policy. (Doc. 32 ¶ 52). Shenk denies the allegation. (Doc. 38 ¶ 52). Moreover, in her deposition, McVey lacked knowledge of this alleged incident, including when the incident occurred, who allegedly reported it to her, or who Shenk allegedly directed to reclassify the position. (*Id*.). McVey did not document the incident or investigate it. Accordingly, doubt has been cast that this incident formed a basis for Shenk's dismissal, and it could allow a finding of pretext.

Defendants further contend that Shenk directed a placement analyst to conduct background investigations prior to obtaining signed releases, which is contrary to established procedure. However, Shenk's testimony is that she discussed a change in the background investigation process to improve efficiency. (Doc. 37-2, Shenk Depo. 80:16–18). Shenk further maintains that she never ordered anyone to conduct background investigations of candidates prior to obtaining releases. (*Id*. at 80:20–21). Additionally, McVey lacked specific knowledge of this incident during her deposition, including when the incident occurred and who reported the incident to her. McVey did not document the incident or investigate it. As such, this alleged incident also lacks factual support and could support a finding of pretext.

Finally, defendants contend Shenk refused to listen to HR staff regarding procedures, but they have failed to produce specific instances or examples. This reason could also be found to be pretextual at this juncture.

*(b) Budget process*

Defendants allege Shenk lacked knowledge of the budget process. Shenk points out that, prior to her work with the PB, she was largely responsible for the budget at DPW and that she worked in the Governor's Office as a fiscal policy specialist. Additionally, former coworkers testified that she performed well in these positions and she received favorable reviews as well as an exceptional pay increase. She therefore argues that she was well-skilled at the budget process.

Although McVey testified that Shenk failed to timely complete the budget narrative, she never informed Shenk that it was late. (Doc. 37-5, McVey Depo. 180:9–12). Tuttle testified that it was Budget Director Dick Dash who was responsible for the budget narrative. (Doc. 37-7, Tuttle Depo. 20–25). Moreover, Shenk contends the budget was timely submitted in October, 2007, some six months prior to her dismissal. (Doc. 37-5, McVey Depo. 179:18–22). Such facts could cast doubt on defendants' reason for terminating Shenk.

### *(c) Pay differential proposal*

Defendants contend Shenk failed to complete an assignment involving a pay differential proposal, requiring McVey to complete it. (Doc. 32 ¶ 27). Shenk avers that she contributed significantly to the proposal, and points to the deposition of Howard Albrecht that he and Shenk jointly put the proposal together. (Doc. 38 ¶ 27; Doc. 37-3, Albrecht Depo. 35:10–38:2). Additionally, Albrecht testified that McVey was pleased with the final product and Tuttle stated that the pay differential was successful when submitted to the Office of Administration. (Doc. 37-3, Albrect Depo. 94:12–16; Doc. 37-7, Tuttle Depo. 107:8–10). Accordingly, this argument could support a finding of pretext.

### *(d) Commins/Williams investigation*

As recounted above,[11] Commins and Williams were investigated for sexual harassment. Shenk asserts that defendants only raise vague assertions about her mishandling of the Commins/Williams investigation.

McVey alleges that Shenk failed to properly advise her how to proceed once the investigations were complete. (Doc. 32 ¶ 39). Shenk denies that she provided McVey with incorrect information. (Doc. 38 ¶ 39). She also points out that during her deposition, McVey was unable to identify anything inappropriate about Shenk's

---

[11] *Supra*, pp. 4-6.

recommendation. (*Id*. ). Further, Shenk testified that McVey told her that she (Shenk) was the "ultimate decisionmaker." (Doc. 38 ¶ 41; Doc. 37-2, Shenk Depo. 138:4). There is no dispute that McVey was, in fact, the ultimate decisionmaker as to discipline. (Docs. 32, 38 ¶ 43).

Management Directive 410.10 required Shenk, as Director of OAS, to review the EEO report and, if a violation was found, she was to report up the chain of command to a committee that would recommend discipline to the Chairman, who would make the final decision on discipline. (Docs. 32, 38 ¶ 40). Despite contrary allegations by defendants, the record shows that Shenk did not "write her own report," but merely wrote a short, two-page recommendation to accompany the report supplied by the EEO office. The recommendation stated that probable cause existed for the allegations of sexual harassment, and suggested that the subjects receive instruction about retaliation against their accusers. (Doc. 37-13, January 28, 2008 Memorandum).

Considering the foregoing weak and conflicting information, the allegation that Shenk mishandled the Commins/Williams investigation could support a finding of pretext.

*(e) Meeting attendance*

Defendants allege Shenk frequently was late to, or missed, meetings which compromised efficiency. Shenk disputes this assertion, noting that defendants have never identified the dates and times of the meetings she allegedly missed. She also contends that McVey would sometimes schedule meetings with little or no notice to Shenk. Inasmuch as this allegation has not been substantiated by defendants, it offers no basis for the decision to dismiss Shenk.

Having cast doubt on some of defendants' reasons for terminating her employment, Shenk has satisfied her burden at this stage to demonstrate that those reasons may be pretextual for discrimination.[12]

*(4) Individual liability*

Shenk asserts that McVey and Tuttle are individually liable under the PHRA for acts of discrimination directed against her. Unlike Title VII, the PHRA provides for individual liability under certain circumstances. Specifically, section 955(e)

---

[12] In cases such as this one, where the defendant proffers several legitimate reasons, a plaintiff may not need to discredit each articulated reason if the plaintiff manages to cast substantial doubt on a fair number of them. *Fuentes v. Perskie*, 32 F.3d 759, 764 n.7 (3d Cir. 1994). "[T]he factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Id. See also Abels v. DISH Network Service, LLC*, --- F. App'x. ----, 2012 WL 6183558, *4 (3rd Cir. Dec 12, 2012).

forbids "any person, employer, employment agency, labor organization or employee to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice...." 43 Pa.Cons.Stat. § 955(e). This provision has been interpreted to apply to the employee's supervisor, although it does not encompass direct acts of harassment by non-supervisory co-employees. *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552-53 (3d Cir.1996). "[A]n individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to § 955(e) for [his] own direct acts of discrimination or for [his] failure to take action to prevent further discrimination by an employee under supervision." *Davis v. Levy, Angstreich, Finney, Baldante, Rubinstein & Coren*, 20 F. Supp. 2d 885, 887 (E.D. Pa.1998).

The parties do not dispute that McVey was Shenk's supervisor and, thus, potentially liability under §955(e) if discrimination is found. Tuttle was second in command when McVey was unavailable, which Shenk contends was "often." (Doc. 38 ¶ 181). Shenk testified she reported to Tuttle in McVey's absence. McVey admitted she likely discussed Shenk's dismissal with Tuttle. (Doc. 37-5, McVey Depo. 157:15–20; Doc. 38 ¶ 183).

Tuttle submitted an affidavit stating that he was unaware that McVey had told Shenk to seek other employment until some time after Shenk left her employment

with the Parole Board. (Doc. 32-2, Ex. D, ¶ 25). Additionally, as to the decision to instruct Shenk to seek other employment, McVey testified that she "probably . . . informed John Tuttle" that she intended to do so. (Doc. 37-5, McVey Depo. 157:12–18). There exists a genuine issue of material fact as to whether Tuttle was her supervisor.

*(B) Retaliation*

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3.

Thus, there are two kinds of protected activity that Title VII's anti-retaliation provision recognizes: (1) participation "in certain Title VII proceedings (the 'participation clause')" and (2) opposition to "discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Philadelphia,* 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)). Both clauses impose an exacting standard on a plaintiff making a Title VII retaliation claim: "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable

belief, in good faith, that the activity they oppose is unlawful under Title VII.
Moreover, the employee's 'opposition' to unlawful discrimination must not be
equivocal." *Id*. (internal citations omitted) (citing *Clark County Sch. Dist. v.
Breeden*, 532 U.S. 268, 271 (2001) (per curiam), *Aman v. Cort Furniture Rental
Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996), and *Barber v. CSX Distribution Servs.*,
68 F.3d 694, 702 (3d Cir. 1995)).

A plaintiff alleging a claim of retaliation need not demonstrate that the
conduct he or she opposed was actually a violation of the law, so long as he or she
possessed a reasonable, good faith belief that the underlying actions of the employer
actually violated the law. *Aman, supra* (discussing a Title VII retaliation case).
Additionally, not every complaint about unfair practices or perceived slights qualify
as "protected activity." *Barber*, 68 F.3d at 701–02.

Establishing a prima facie case of retaliation under Title VII requires a
plaintiff to adduce evidence that (1) she engaged in activity protected by Title VII,
(2) the employer took adverse action against her, and (3) there was a causal
connection between the plaintiff's engagement in protected activity and the adverse
employment action. *Moore*, 461 F.3d at 340–41 (quoting *Nelson v. Upsala Coll.*, 41
F.3d 383, 386 (3d Cir. 1995); *accord Farrell v. Planters Lifesavers Co.*, 206 F.3d
271, 279 (3d Cir. 2000). If the plaintiff makes this prima facie showing, the same

*McDonnell Douglas* burden-shift approach applies. *Moore*, 461 F.3d at 342

(quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)) (citing

*Fuentes, supra*).

The parties do not dispute the second element—defendants took adverse

action against Shenk when McVey directed her to seek other employment on

April 1, 2008.[13] They disagree whether Shenk has satisfied the first and third

elements of a prima facie case.

*(1) Protected activity*

Shenk maintains that she engaged in protected activity in the following

instances: raising coworkers concerns of harassment and retaliation by Scicchitano;

meeting with Mix regarding a report that women and minorities were not receiving

job offers; and finding that Commins and Williams engaged in sexual harassment

and recommending that they receive corrective instruction. Defendants contend that

such acts do not constitute protected activity because they concern only generalized

complaints of unfair treatment, which are insufficient to establish a prima facie case

of retaliation. *See Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450

F.3d 130, 135 (3d Cir. 2006) (citing *Barber, supra*).

---

[13] Shenk also contends that the April 1, 2008 directive was one of several adverse actions she suffered and that, for purposes of establishing a retaliation claims, the exact timing of the adverse actions is a disputed material fact. *See* Doc. 39, p. 32–33.

*(a) Coworkers complaints*

Shenk alleges that coworkers were concerned about retaliation due to their involvement in the Scicchitano investigation. Shenk relayed their concerns to McVey. Defendants contend that because these coworkers were not demoted, removed from their positions, or lost pay, there was no illegal employment practice implicated. Shenk testified in her deposition, however, that the Director of Human Resources, Brenda Estep, advised Shenk that she was removing work responsibilities from the women in question in order to have them "downgraded." (Doc. 37-2, Shenk Depo. 107:16–109:17). Shenk then approached the women, who advised they felt they were being retaliated against. (*Id*.) Shenk contends that she was subject to dismissal as a result of her advocacy on behalf of her coworkers. Consequently, her actions in reporting the concerns of her coworkers constitutes protected activity.

*(b) Employment opportunities to women and minorities*

Shenk also maintains that she engaged in protected activity when she met with Mix to address a report that too few job offers were being made to women and minorities. She also maintains that she raised the issue with Tuttle. Defendants submit that the Mix's report of underutilization of certain demographic group is not evidence of discrimination by the Parole Board but is an essential part of Mix

performing her job as EEO Director. However, Shenk's complaints relate not to Mix's report itself but to the findings of the report — that the Parole Board was not properly or adequately offering employment opportunities to women and minorities. In an effort to correct this shortcoming, Shenk met with Tuttle to try to work out a solution. Such action is protected activity.

*(c) Commins/Williams investigation*

Shenk contends that her work on the Commins/Williams investigations is also protected activity. Defendants contend that McVey was dissatisfied with Shenk's handling of this investigation and that Shenk provided McVey with incorrect information and/or advice. As discussed above, *supra*, pp. 24-25, Shenk added a two-age recommendation to EEO Director Mix's investigative report prior to sending it up the line. Her recommendation was to advise Commins and Williams regarding the rules against retaliatory conduct towards the female employees who reported harassing and discriminatory conduct. Under the facts presented, a reasonable factfinder could conclude that Shenk was engaging in a protected activity, e.g. making sure that Title VII protections were being enforced in the workplace. Accordingly, Shenk has established that her actions in the Commins/Williams investigation constitute protected activity.

*(2) Causal link*

"[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse, supra* at 503 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997)). The Third Circuit has stated:

> We have recognized two primary ways to substantiate a causal connection between the protected activity and an adverse employment action: showing that the temporal proximity between the two is "unusually suggestive," or pointing to an "ongoing antagonism" between the plaintiff and defendant. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir.2000) (internal citations omitted).

*Gladysiewski v. Allegheny Energy*, 398 F. App'x. 721, 723 (3d Cir. 2010); *Abramson v. William Paterson Coll.*, 260 F.3d 265, 288 (3d Cir.2001) (noting that the Third Circuit "has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism.") (citing *Farrell*, 206 F.3d at 281 and *Woodson*, 109 F.3d at 920–21).

A causal connection can be inferred when the timing of the adverse employment action is "'unusually suggestive'" of retaliatory motive. *Id*. (quoting *Robinson*, 120 F.3d at 1302; *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir.2007) ("In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its

own, to establish the requisite causal connection."). For a causal connection to be made, the temporal proximity between the occurrences has generally been in terms of hours or days, not months. *See, e.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (holding that a causal link can be inferred where only two (2) days passed between the employee's protected activity and the adverse employment action); *Whitman v. Proconex, Inc.,* No. 08-2667, 2009 WL 141847, *10–12 (E.D. Pa. Jan. 20, 2009) (finding that discharge within minutes of returning from FMLA leave was "unduly suggestive" of a causal link); *Reinhart v. Mineral Techs. Inc.*, No. 05-4203, 2006 WL 4050695, *10–11 (E.D. Pa. Nov. 27, 2006) (finding that the decision to terminate an employee within twenty-four (24) hours after returning from his initial FMLA leave met "the bare minimum of sufficiency to establish causation"). *But see Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir.2004) (finding no temporal proximity unduly suggestive of retaliation with two months between protected activity and termination); *Thomas,* 351 F.3d at 114 (finding that three weeks between filing of complaint and termination did not present suggestive temporal proximity); *Tarr v. Fedex Ground Package System, Inc.*, No. 08-1454, 2010 WL 331846, *10 (W.D. Pa. Jan. 28, 2010) ("Plaintiff complained in July of 2006 and was terminated in April of 2007. There is therefore, nothing unusually suggestive about the timing of his termination."); *Koteles v. ATM Corp. of America*,

Civ. A. No. 05-1061, 2008 WL 4412098, *16 (W.D. Pa Sept. 23, 2008) (noting that while the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the span of several months has been considered too great).

In making the determination of whether the plaintiff has established a causal connection between the protected activity and the adverse action taken, the court may consider "a broad array of evidence." *Farrell*, 206 F.3d at 281, 284 (citation omitted). Thus, where temporal proximity is not unusually suggestive on its own, the court looks to the evidence, as a whole, to determine whether it is sufficient to raise an inference of retaliation. *Farrell*, 206 F.3d at 280; *see also Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir.2003) ("In cases such as this one, where the temporal proximity is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test [.]" (citation and internal quotation marks omitted)); *Abramson, supra.*. In making this determination, the court may consider intervening antagonism or retaliatory animus, inconsistencies in the employer's proffered reasons for taking the adverse action, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id*. at 279–81.

As noted above, Shenk asserts that she suffered retaliation for a engaging in several protected activities: 1) expressing to McVey the concerns of her coworkers that they would suffer retaliation for their participation into the Scicchitano investigation; 2) raising concerns that the Parole Board was not offering sufficient employment opportunities to women and minorities; and 3) making a recommendation in connection with the Commins/Williams investigation. Thus, there is a time span of less than one month[14] between the most recent of these protected activities and being given the directive to find other employment on April 1, 2008.

Shenk also asserts that there was ongoing antagonism or animosity toward her. Shenk points to statements made by McVey, *to wit*, that she reached the "breaking point" with Shenk in connection with her involvement in the Commins/Williams investigation; that Tuttle could hire whomever he wanted (in response to Shenk's questioning of hiring practices); and that Shenk was a "getcha-type" of person. Tuttle also stated that he would not be told by Shenk whom he could hire, and Laub told Shenk to shred her finding and recommendation in the Commins/Williams report. Shenk further contends that the retaliatory animus

---

[14] Although Shenk made her report on the Commins/Williams investigation on January 28, 2008, both she and McVey continued to work on the matter in February and it still had not been resolved in March. (Doc. 38 ¶ 29).

continued while she was out on FMLA leave when McVey threatened her with administrative action and thereafter she mailed her a "scathing" draft performance review in July, 2008.[15]

Viewing the record as a whole, Shenk has identified evidence supporting a causal link between her protected activities and the adverse employment actions, including the April 1, 2008 directive that she look for other work. Consequently, she has satisfied the fourth element of a prima facie case of retaliation. It is therefore recommended that summary judgment be denied on these claims.

*(C) Disability Discrimination*

The ADA contains an "association provision," which prohibits an employer from "excluding or otherwise denying equal jobs or benefits to" an individual based upon the individual's relationship or association with a disabled person. 42 U.S.C. § 12112(b)(4).[16] To establish a prima facie case of association discrimination, a plaintiff must prove the following:

(1)      the plaintiff was "qualified" for the job at the time of the adverse employment action;

---

[15] As noted above, Shenk contends there is a genuine issue of material fact as to when the adverse employment action occurred. Thus, animosity directed to her after April 1, 2008 may still be evidence of a causal connection if the factfinder concludes Shenk suffered an adverse action on a later date.

[16] The PHRA contains a similar provision prohibiting association discrimination.

(2)     the plaintiff was subjected to adverse employment action;

(3)     the plaintiff was known by his employer at the time to have a relative or associate with a disability; and

(4)     the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Erdman v. Nationwide Ins. Co.*, 621 F. Supp. 2d 230, 234 (M.D. Pa. 2007) (citations omitted).

The association provision "does not obligate employers to accommodate the schedule of an employee with a disabled relative." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir.2009) (noting that the "plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled."). Consequently, a plaintiff must show that the defendant was motivated by the disability rather than by the plaintiff's absence from work; that is, he must show that he would not have been fired if he had requested time off for a different reason. *See id.*

For purposes of the present motion, Shenk has satisfied the first two elements. As concluded above, she was qualified for the position which she held and she suffered an adverse employment action when, on April 1, 2008, she was given a directive to find other work. The parties dispute whether defendant knew Shenk had

a disabled relative and whether the circumstances raise a reasonable inference that Shenk's mother's disability was a determining factor in the defendants' decision.

*(a) Knowledge*

Shenk contends that she informed McVey of her mother's disabilities and that McVey was hostile to Shenk's absences when she was caring for her mother. Specifically, Shenk asserts that on one occasion McVey directed Shenk to return to work when she had taken leave to take her mother for an appointment.[17] Shenk also states that McVey suggested that she put her mother in a nursing home. Shenk thus submits that the circumstances create an inference that her mother's disability was a factor in McVey's April 1, 2008 directive issued to her.

Defendants argue, however, that there is no evidence that McVey was aware of Shenk's mother's disabilities, and that any knowledge that Shenk's mother was ill or required care would not necessarily lead her to conclude that the she was disabled. They contend that Shenk informed McVey she required leave to take her mother for appointments because she was ill, but that knowledge of disability cannot be imputed therefrom. Moreover, Shenk's requests for leave were never denied. (Doc. 32-3, Albrect Depo. 132:24–133:1).

---

[17] Shenk had requested leave to take her mother for an appointment and then celebrate a birthday. While she did take her mother as requested, she returned to the office and was unable to celebrate the birthday. (Docs. 32, 38 ¶ 95).

Given the fact that the parties dispute to extent to which Shenk informed McVey of her mother's medical condition, a genuine issue of material facts exists. For purposes of a motion for summary judgment, the court must presume that McVey knew Shenk's mother was disabled.

*(b) Determining factor*

Defendants argue that even if they had knowledge that her mother was disabled, Shenk is unable to establish that the disability was a determining factor in the decision to terminate her. McVey gave Shenk the directive to find other employment on April 1, 2008. There is no evidence of leave requests by Shenk specifically related to the care of her mother immediately prior to the April 1, 2008 meeting. Indeed, to establish this factor Shenk must demonstrate that McVey's directive that she find other work was motivated by an unfounded assumption regarding a need for future absences, not merely by her history of leave requests to care for her mother. *See Reddinger v. Hosp. Cent. Servs., Inc.*, 4 F.Supp. 2d 405, 409 (E.D. Pa.1998) ("[I]f an employee's termination is . . .the result of a record of past absences and/or clear indication that additional time off will be needed in the future, no ADA violation has occurred."); *Pittman v. Moseley, Warren, Prichard & Parrish*, No. 01-279, 2002 WL 2007880, at *6 (M.D. Fla. July 29, 2002) ("[A]n employer's decision to terminate an employee based on an established record of

absences to care for a disabled person and a clear indication that additional time off is needed for the same purpose does not violate the "association" provision of the ADA.").

The two incidents pointed out by Shenk—McVey suggesting that she put her mother in a nursing home and McVey requesting that Shenk return to the office after taking her mother for an appointment—have not been correlated, either factually or temporally, to the directive that she find other work, nor do they exclusively indicate an animosity for associates of the disabled. Shenk concedes that her leave requests were not denied. The evidence of record indicates that the directive given to Shenk was related to the defendants' view that she was performing poorly in her position.

In sum, there is no evidence to suggest that defendants granted employee leave requests for certain personal or family reasons but not for reasons related to the disability of an associate. Lacking evidence of employment actions based on unfounded assumptions or of differential treatment, Shenk has not established a claim for association disability discrimination. As such, it is recommended that summary judgment be granted on the association discrimination claim.[18]

_____

[18] With respect to Tuttle, defendants maintain not only that he played no role in the decision-making process to give Shenk and ultimatum and/or terminate her but also that

(continued...)

*(D) USERRA*

The Uniformed Services Employment and Reemployment Rights Act ("USERRA") was enacted by Congress in 1994 to "strengthen ... existing veterans' employment and reemployment rights provisions," *Gummo v. Village of Depew*, 75 F.3d 98, 105 (2nd Cir.1996), and to "protect the ability of our veterans to obtain employment upon returning to civilian life." *Middleton v. City of Chicago*, 578 F.3d 655, 659 (7th Cir.2009). Consistent with this purpose, USERRA seeks to "encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service," minimize disruption in the lives of both service members and their employers, and "prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a). The Act provides:

> "A person who is a member of ... or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, ... or obligation."

38 U.S.C. § 4311(a). It elaborates further:

---

[18](...continued)
there is no evidence that he was aware of her mother's disability. Accordingly, a claim for association discrimination has not been established against him.

"An employer shall be considered to have engaged in actions prohibited ... under subsection (a), if the person's membership ... is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership."

§ 4311(c). The Act's protections extend to non servicemembers who take action to protect servicemembers. *See* 38 U.S.C. § 4311(b).[19]

An employee making a USERRA discrimination claim shoulders "the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." *Sheehan v. Department of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (quoting *National Labor Relations Bd. v. Transportation Management Corp.*, 462 U.S. 393, 400–01, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) *abrogated by Director, Office of Workers' Compensation v. Greenwich Collieries*, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994) (on other grounds)). Once the employee has met this burden, the burden shifts to the employer to show, by a preponderance of the evidence, that

---

[19] 38 U.S.C. § 4311(b):

An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

the employer would have taken the adverse action anyway, for a valid reason. *Sheehan*, 240 F.3d at 1013.

The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence. *Id*. at 1014. Under USERRA, discriminatory motive may be reasonably inferred from a variety of circumstantial factors including: proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses. *Id.*

In the present case, Shenk contends that she has put forth evidence of discrimination against military service members. Specifically, she claims she discovered a memo dated October, 2007 which, in discussing an applicant, used anti-military stereotypes to justify not offering the applicant, a Marine, the position. The memo noted the applicant's background as a Marine sniper and a paid mercenary and that his answers in the interview indicated his was comfortable in these roles. (Doc. 37-16, p. 3). The memo further states that there was a discussion of the fear in "placing a Board issued firearm in the hands of this gentleman and

what could be the result if an offender insulted him or made him upset." (*Id*.).
Although she contends that the memo indicated that veterans could not be trusted
with firearms because they might become unhinged, the memo does not make such
an assumption and limits its breadth to a specific candidate. Shenk states that when
she brought the memo to McVey's attention, she dismissed it. Shenk maintains that
she also raised her concerns with Tuttle.[20]

No other evidence is offered to show animus towards veterans. Additionally,
Shenk admits that when a veteran on the certification list had been missed and
mistakenly not offered the position, the Parole Board took immediate steps to make
an appointment consistent with the CSC's rules and regulations. (Docs. 32, 38 ¶
165). Shenk also concedes that the EEO Director was unaware of anyone being
discriminated against because of veteran status. (*Id*. ¶ 168). Further, Shenk testified
that the Parole Board hired employees using the CSC's list of eligible candidates
and that the CSC checked to make sure the Parole Board didn't pass over veterans.
(Doc. 32-3, Shenk Depo. 69:19–70:9). During her tenure, Shenk could only recall
one incident where the CSC failed to make a proper hire, but was unsure if it was
related to the Parole Board failing to give appropriate consideration to a veteran's

---

[20] Shenk also alleges that Tuttle stated that she couldn't tell him who to hire but she
related this remark to discrimination based on race and gender, not veteran status. (Doc.
1, ¶ 39).

status. (*Id*. p. 77:23–78:4). Although she maintains that veterans were not being properly hired by the Parole Board, Shenk could not identify any individuals or circumstances to establish this fact. (Docs. 32, 38 ¶ 174).

Based on all the evidence, Shenk has failed to demonstrate that the Parole Board discriminated against veterans or against anyone who acted to protect the rights of servicemembers. Without more, the memo, alone, fails to satisfy her burden. *See Gibson v. Sharon Regional Hosp. System*, No. 09-604, 2011 WL 1044657, *19 (W.D. Pa. March 18, 2011) ("To survive summary judgment, there must be substantial supporting evidence other than isolated remarks of alleged discrimination."); *Lincoln v. Momentum Systems Ltd.*, 86 F. Supp.2d 421, 432 (D.N.J. 2000) ("'stray' remarks or an isolated comment are insufficient to establish discrimination."). Consequently, it is recommended that summary judgment be granted in favor of defendants on this claim.

*(E) FMLA Retaliation*

The FMLA was enacted to balance the demands of the workplace with the needs of employers and to entitle employees to take reasonable leave for medical reasons. 29 U.S.C. § 2601(b). To accomplish these goals, the act provides that an eligible employee is entitled to 12 work-weeks of leave during any given 12-month period for certain qualifying events, including a "serious health condition that

makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA further entitles eligible employees to reinstatement at the end of FMLA leave to the position of employment held before leave or to an "equivalent position." 29 U.S.C. §§ 2614(a)(1)(A), (B).[21]

There are two relatively distinct causes of action under the FMLA: (1) interference provisions declare it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in FMLA, and (2) the statute prohibits an employer from discriminating or retaliating against an employee for exercising rights under the FMLA. 29 U.S.C.A. § 2615(a) (1, 2).

An FMLA retaliation claim is contemplated by section 825.220©[22] of the regulations implementing 29 U.S.C. § 2615(a). 29 C.F.R. § 825.220©); *see Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir.2004). To

---

[21] An equivalent position is one which is substantially equal or similar in terms of employment benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1)(B); 29 C.F.R. § 825.215

[22] 29 C.F.R. § 825.220(c) provides:
(c) An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

establish a prima facie case for retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. *Conoshenti*, 364 F.3d at 146. The parties do not dispute that Shenk took FMLA leave and thus satisfies the first element of her prima facie case. The other elements are disputed.

*(a) Adverse employment action*

The term "adverse action" in the context of the FMLA refers to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Weston v. Commonwealth of Pennsylvania*, 251 F.3d 420 (3d Cir.2001) (citing *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). "Courts have operationalized the principle that retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment into the doctrinal requirement that the alleged retaliation constitute 'adverse employment action.'" *Robinson,* 120 F.3d at 1300.

Shenk argues that she suffered an adverse employment action while she was out on FMLA leave. She contends that McVey threatened her with administrative action and mailed her a draft of a poor performance evaluation as a threat if she did

not voluntarily quit. Shenk claims these acts were in retaliation for taking FMLA leave.

Negative performance evaluations may sometimes constitute an adverse employment decision under the FMLA retaliation provision. *See, e.g., Boandle v. Geithner*, 752 F.Supp.2d 540, 565 (E.D. Pa. Nov. 2, 2010) (finding an adverse action for a retaliation claim could exist where "[a]long with the negative performance evaluation, [an employee receives] an Opportunity to Improve letter affording him 120 days to improve his performance, inform[ing] him that his work would be periodically reviewed, and [telling] him that if he did not improve his performance, he would face termination"). Further, unpleasant criticisms of job performance, without some evidence of tangible injury or harm, do not constitute adverse employment actions. *See Storey*, 390 F.3d at 764; *see also Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1241 (11th Cir.2001) (criticisms of an employee's job performance, either written or oral, that do not lead to tangible job consequences rarely form the basis of discrimination suit).

McVey testified that the purpose of the evaluation was not to threaten Shenk that she would have a poor review on her permanent record if she did not secure other employment but rather to inform Shenk that she was not performing well. (Doc. 37-5, McVey Depo. 162:7–163:11). This does not seem credible in light of

the factual background. A reasonable person could certainly interpret the letter and the extremely negative draft performance evaluation as a threat of termination and a poor performance review on their permanent record. For purposes of summary judgment, Shenk has identified an adverse employment action taken after she requested FMLA that would satisfy the second element of her prima facie case.

*(b) Causal connection*

The only arguable adverse employment action is the July 2, 2008 letter from McVey to Shenk.[23] To establish a causal connection, Third Circuit cases instruct the court to focus on two main factors in determining whether there is a causal link in an FMLA retaliation claim – timing, and evidence of ongoing antagonism. *Abramson, supra*. As the letter sent by McVey to Shenk on July 8, 2007 was in midst of her FMLA leave, the timing is suggests it is related to her FMLA leave. Accordingly, Shenk has established the fourth element of a prima facie case. It is therefore recommended that summary judgment be denied on Count VI.

---

[23] The April 1, 2008 directive by McVey that Shenk seek other employment  was taken prior to Shenk's request for FMLA leave. Thus, having occurred before her FMLA leave, it cannot be the cause of the adverse employment action. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. at 272 (when adverse employment action occurs prior to plaintiff's protected activity there is "no evidence whatsoever of causality.").

## V. Recommendation

For the foregoing reasons, it is respectfully recommended that defendants'

motion for summary judgment (Doc. 31) be granted in part and denied in part.

Specifically it is recommended that:

1.   The motion for summary judgment be denied as to Counts I and II (retaliation under Title VII and PHRA).

2.   The motion for summary judgment be denied as to Counts III and IV (gender discrimination under Title VII and PHRA).

3.   The motion for summary judgment be denied to the extent the complaint asserts a claim for individual liability against Tuttle and McVey in Count IV.

4.   The motion for summary judgment be denied on Count VI (FMLA).

5.   The motion for summary judgment be granted on Count VII (ADA).

5.   The motion for summary judgment be granted on Count V (USERRA).

Signed on March 11, 2013.


**MILDRED E. METHVIN**
**U. S. MAGISTRATE JUDGE**